UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| KIMBERLEE A. F.,[1]<br><br>   Plaintiff,<br><br>   v.<br><br>KILOLO KIJAKAZI,<br><br>   Defendant. | Case No. 21-cv-02290-RMI<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 21 |

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. *See* Admin. Rec. at 19-34.[2] Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council (*see id*. at 5-7), thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both Parties have consented to the jurisdiction of a magistrate judge (dkts. 7, 9), and both parties have moved for summary judgment (dkts. 18, 21). For the reasons stated below, Plaintiff's motion for summary judgment is granted, and Defendant's motion is denied.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set

---

[1] Pursuant to the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Plaintiff's name is partially redacted.

[2] The Administrative Record ("AR"), which is independently paginated, has been filed in seventeen attachments to Docket Entry #15. *See* (dkts. 15-1 through 15-15).

aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and directs courts in their review of factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

In February of 2018, Plaintiff filed an application for Title II benefits alleging an onset date of November 2, 2014. AR at 19. On February 12, 2020, an ALJ entered an unfavorable decision, finding Plaintiff to be not disabled between her alleged onset date (November 2, 2014) and June 30, 2018, the date last insured. *See id.* at 19-34. In September of 2020, the Appeals Council denied Plaintiff's request for review. *Id.* at 5-7. A few months later, in March of 2021, Plaintiff sought review in this court (*see* Compl. (dkt. 1) at 1-3) and the instant case was initiated.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff raises two claims, the first of which assigns error to the ALJ's evaluation of the limitations attending Plaintiff's severe migraines and in the evaluation of Plaintiff's testimony; the second claim assigns error to the ALJ's adverse persuasiveness findings of Plaintiff's treating physician (Dr. McAtee) "without proper evaluation or rationale." *See* Pl.'s Mot. (dkt. 18) at 11. Accordingly, the following is a summary of the evidence relevant to these claims.

*Hearing Testimony*:

On January 9, 2020, the ALJ convened a hearing at which Plaintiff and the vocational

expert ("VE") testified. *Id*. at 41-67. In pertinent part, Plaintiff testified that she had previously lost several jobs because her headaches caused her to frequently miss work. *Id*. at 48-49. She testified that she suffers from migraine headache attacks up to 15 times a month; and, on one or two occasions per week, Plaintiff's headaches were so severe that she was unable to work at all or had no choice but to leave early. *Id*. at 49. Not having ever been able to identify the trigger for her migraine attacks, Plaintiff testified that the level of pain associated with her migraines typically ranges between level 8 or 9 on a scale of 1 to 10 – and Plaintiff endures such pain for about 5 hours at a time. *Id*. at 50. Having tried various medications – including narcotics – Plaintiff testified that nothing has managed to abate the pain or diminish the frequency of the attacks. *Id*. at 51-52. She specified that in addition to the pain, coupled with the fact that the migraines affect all of her sensory systems (including making her intolerant to light, noise, and odors), the medications themselves also sometimes involve difficult-to-tolerate side-effects such as burning sensations in her head, eyes, neck, and back. *Id*. at 51-52, 60. All she can do during her attacks is to recline in a dark room, while using a certain device (something she referred to as a pressure point tool) to help dull the pain in her neck. *Id*. at 52. In short, these symptoms have relegated Plaintiff to a reclined position in a dark room for extended periods of time on three or four occasions each week. *Id*. at 52, 61-62. Plaintiff's pain has significantly diminished her ability to engage in even the most mundane activities – it is only one or two days per week that she feels able to engage in household and personal care chores. *Id*. at 57. During her migraine attacks, Plaintiff is even unable to read or watch television – all she can do is recline in a dark and silent room. *Id*. at 58. That said, while she does not do the grocery shopping for her household, she sometimes accompanies her husband to the store, and she occasionally drives herself to appointments or takes her child to school. *Id*. at 58-59.

Given that Plaintiff's husband works, it has been incumbent on her to care for their children during his work hours, however, she has been unable to do so safely. *Id*. at 53. On one occasion, her son suffered an elbow injury when she was supposed to be watching him, however, she was unable to do anything about it because she was in the throws of a migraine attack. *Id*. This set of conditions has forced her husband to find and secure employment that allows him to work

3

from home such that he can simultaneously care for the children when Plaintiff is unable to do so due to her impairments. *Id*. In addition to the migraines, Plaintiff also experiences issues with her neck and upper back pain due to her spinal stenosis which causes her muscles to constantly feel tense. *Id*. at 53-54. Doctors have injected medication directly into her neck, however, she has yet to experience any improvement in that condition. *Id*. at 54. Other consequences of these conditions are as follows: pain routinely interferes with her ability to sleep; she has to spend a good deal of time using heat or ice to treat her pain; she experiences racing thoughts; and, she has found it increasingly difficult to control her temper. *Id*. at 55-56.

Following Plaintiff's testimony, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and work experience, with a residual ability to engage in light work but subject to the following limitations: standing and walking limited to four hours daily, sitting up to six hours daily, lifting and carrying up to 20 pounds occasionally, and up to 10 pounds frequently, with occasional postural changes and occasional reaching overhead, while avoiding concentrated exposure to noise, vibration, and hazards. *Id*. at 64. The ALJ then added that the individual could understand, remember, and carry out simple instructions that can be learned in less than 30 days while being able to adequately sustain concentration, persistence and pace, along with being limited to occasional non-collaborative interactions with co-workers and supervisors, with no teamwork – and able to work in close proximity to, but not directly with, the general public, and that she could adapt to simple workplace changes. *Id*. at 63-64. The VE testified that such an individual could perform work as an electronics worker, printed circuit board pre-assembler, or final assembler. *Id*. at 65. The VE then testified that if such an individual were absent from work as little as three times per month – or, if that person were to be "leaving early that frequently" (i.e., three times per month) – that would preclude sustaining competitive employment. *Id*.

*Medical Evidence Related to Physical Impairments*:

As it relates to Plaintiff's history of back pain, a 2015 MRI of her lumbar spine showed degenerative changes with a left posterolateral disc bulge at L4-5 coupled with an asymmetric mild effacement of the left lateral recess. *Id*. at 458. Plaintiff's treatment provider, Mark Levy,

4

M.D., noted that "[t]here appears to be contact with the left S1 nerve root in the lateral recess," and that "[a]dditional spondylitic change" was also manifest. *Id*. A CT scan of the cervical spine revealed mild spondylitic changes at C5-C6. *Id*. at 460. An MRI of Plaintiff's cervical spine revealed another posterior disc bulge with impression upon the thecal sac (which is the membranous sac covering the spinal cord and containing cerebrospinal fluid) but without impingement. *Id*. at 464 (Dr. Levy also noted that "[t]here may be mild narrowing of the left neural foramen at this level.").

As for Plaintiff's migraine headaches, in September of 2015, she reported as many as 16 to 20 days of suffering such headache attacks per month. *Id*. at 444. Consequently, one of her many treatment providers, Perminder Bhatia, M.D., modified her medication regimen and dosing (regrettably, this theme – a constantly changing of Plaintiff's medications to no avail – repeats itself throughout the course of her treatment history). *Id*. at 445. A testament to the fact that her headaches were resistant to treatment was the fact that (despite the changed medicinal regimen) two months later, in November of 2015, she was experiencing the headaches at an *increased* frequency which had, by then, become a daily event. *Id*. at 473. The following month, in December of 2015, Plaintiff reported that the headaches had become worse – a state of affairs that would persist well into mid-2016. *See id*. at 484, 518. For this reason, in April of 2016, another one of Plaintiff's treatment providers, Ernestina H. Saxton, M.D., Ph.D., ordered additional imaging. *Id*. at 777-79.

In conjunction therewith, Plaintiff underwent treatment with Dr. Saxton (a neurologist) for her headaches, phonophobia, osmophobia (a hypersensitivity to odors), blurred vision, nausea, and vomiting. *Id*. at 767-68. Dr. Saxton's examination revealed a decreased sensation to light touch and pinprick contacts on Plaintiff's right forehead, decreased strength in her distal right upper extremity on finger abduction, finger extension, wrist extension, and elbow extension; and, the examination also revealed slightly decreased strength in Plaintiff's right lower extremity. *Id*. at 768. Dr. Saxton unsurprisingly diagnosed Plaintiff as suffering from migraine headaches and prescribed another new medicinal regimen as a proposed treatment. *Id*. at 768-69. Dr. Saxton also recommended Botox injections as part of an effort to abate her chronic migraines – presumably by

5

killing some of the associated or affected nerves – a procedure for which special insurance authorization had to be requested. *Id*. at 769.

On June 13, 2016, another of Plaintiff's treating physicians, Ann T. Holmes, D.O., noted muscle tenderness in Plaintiff's neck, for which she prescribed various medications (including narcotic pain medications) while referring Plaintiff to a pain management specialist. *Id*. at 557-58. Several months later, on September 12, 2016, Plaintiff was again treated for her ongoing neck pain – it was observed that she suffered pain that migrated from the top of the head to her neck and across her shoulder blades. *Id*. at 570. Dr. Holmes also observed tenderness and spasms in the Plaintiff's cervical spine, causing her to continue Plaintiff on her narcotic prescriptions while also recommending pain management injections. *Id*. at 573. Throughout 2016 and 2017, Plaintiff complained of persistent and frequent (daily) headaches; as a result, she was advised to follow up with a neurologist and a pain management specialist. *Id*. at 573-74, 602, 618-21, 752, 754, 936, 940. In January of 2017, Plaintiff also complained of daily neck pain; and, upon physical examination, Dr. Holmes found that Plaintiff's neck manifested a decreased range of motion coupled with pain and spasms. *Id*. at 602, 605. Pain management techniques and treatment with a neurologist did nothing to abate her migraines, causing her to ask to see a different neurologist. *Id*. at 752.

In June of 2017, Plaintiff was evaluated for treatment by John F. Kirby, M.D., relating to her neck pain, muscle soreness, tenderness, and tightness, as well as for her headaches. *Id*. at 672. Dr. Kirby observed tenderness in her cervical spine, in the lateral epicondyles (an element of the elbow joint), in the anterior chest wall and across the entire dorsal surface, especially at the lumbar region and in the greater trochanters (elements of the upper thigh bone). *Id*. at 672-73. Dr. Kirby diagnosed Plaintiff as suffering from fibromyalgia and prescribed various pain control medications. *Id*. at 673. Two months later, Plaintiff reported that physical therapy had actually caused a worsening of her pain, and that it had no effect on her headaches. *Id*. at 674-75.

The following year, in August if 2018, Dr. Holmes noted that Plaintiff's migraine headaches were causing her pain all over her body; the pain was worse on the right side. *Id*. at 936. Given that odors, sound, light, and movement worsened the headaches (*see id*.), Dr. Holmes

1   diagnosed Plaintiff with chronic migraines. *Id*. at 940. Later that year, after relocating to Eureka,
2   California, Plaintiff commenced treatment under the care of Michael Schafle, M.D., in October of
3   2018 – once again, her chief complaints were rooted in her chronic migraine headaches. *Id*. at 945.
4   At that point, and for the several succeeding months, Plaintiff's headaches were occurring daily,
5   and medications were largely ineffective. *See id*. at 942, 945-46.

6   Several months later, in February or 2019, Plaintiff began receiving treatment at the Open
7   Door Community Health Centers for her various impairments, including her persistent migraines.
8   *Id*. at 991. At the outset, Plaintiff executed the necessary release forms so that her new physicians
9   could have the benefit of reviewing all of her medical records. *Id*. at 992. Among her new
10  treatment providers was Joni McAtee, M.D., who immediately noted Plaintiff's longstanding
11  history of depression and migraines and ordered additional testing. *Id*. at 100-02. Shortly
12  thereafter, in May of 2019, Plaintiff was referred to Eureka Outpatient Imaging for further imaging
13  of her cervical spine which revealed degenerative changes; at C4-C5 there was mild posterior disc
14  osteophyte formation and asymmetric right uncovertebral joint squaring resulting in mild-
15  moderate right neural foraminal narrowing; and, at C5-C6 there was mild abdomen moderate
16  posterior disc osteophyte formation and bilateral uncovertebral joint squaring resulting in
17  circumferential effacement of the cerebrospinal fluid space, minor flattening of the spinal cord,
18  and mild narrowing of the central canal and neural foramina. *Id*. at 916-17. A subsequent
19  examination the following month revealed cervical paraspinal muscle spasms, with limited range
20  of motion for lateral and forward flexion of Plaintiff's neck. *Id*. at 1008.

21  In June of 2019, Plaintiff's migraine situation was largely unchanged, she continued to
22  suffer as many as 19 migraine headaches per month. *Id*. at 1007. Consequently, Dr. McAtee
23  ordered still more imaging while, once again, changing Plaintiff's medicinal regimen and dosing.
24  *Id*. at 1009. Ultimately, as had been the case before, these adjustments and new imaging proved
25  futile as Plaintiff reported – in September of 2019 – that her migraines had worsened, and (to
26  make matters even worse) Plaintiff reported that one of her new medications was causing side
27  effects that were almost as bad as the migraine pain – namely, a burning sensation in her spine,
28  head, neck, and shoulders. *Id*. at 1011-12. As a result, Dr. McAtee once again changed Plaintiff's

7

medicinal regimen and dosing. *Id*. at 1012-13. The following month, in October of 2019, Plaintiff reported that the new medicine had failed to remediate her headaches. *Id*. at 1015. Thereafter, with yet another change in medicinal regimen and dosing, Plaintiff's migraine situation improved in one regard (frequency) while worsening in another regard (intensity) – in November of 2019, Plaintiff reported that she had only suffered 11 migraines during the month, but that each one was more severe in degree than had previously been the case. *Id*. at 1019.

*Medical Evidence Related to Mental Impairments*:

In early 2016, Plaintiff reported to Dr. Holmes that she was experiencing increasing difficulty with her already-low ability to cope with stress, with her frustration tolerance, and with managing her anger. *Id*. at 498. Specifically, Plaintiff reported trouble managing the stress and anger associated with the behavior of her 2-year-old child. *Id*. This external trigger (having to cope with her unruly 2-year-old's rowdiness) exacerbated a number of her other symptoms (such as her poor sleep and the symptoms associated with her depression) – as a result, Dr. Holmes changed her medicinal regimen and dosing once again. *Id*. However, as was the case before, this change in regimen and dosing also proved ineffective, particularly since the new medications caused her to experience difficulties with her memory and nausea while failing to affect her issues with stress, anger, and frustration tolerance. *Id*. at 501, 554, 580, 587 (things as routine as juice spilling from a toddler's "sippy cup" would elicit an uncharacteristic explosive response from Plaintiff). Once again, Dr. Holmes increased the dosing of Plaintiff's medications, but to no ultimate avail as all her symptoms persisted. *See id*. at 592, 602, 619-20.

Concerned about her depleted frustration tolerance and her increasingly aggressive responses to the ordinary incidents of parenthood, Plaintiff sought out a psychiatric evaluation and, in July of 2017, she was evaluated by Joseph Alimasuya, M.D., for further treatment in this regard. *Id*. at 685-727. Dr. Alimasuya diagnosed Plaintiff with ADHD, manic episodes without psychotic symptoms, and bipolar disorder. *Id.* at 727. Regarding Plaintiff's symptoms, Dr. Alimasuya observed: psychomotor agitation, mood elevations, flights of ideas, subjective experience that her thoughts were racing; a decreased need for sleep; being more talkative than usual to the point where Plaintiff "feels pressure to keep talking"; irritability; depressive episodes

8

that begin gradually and last for days; feelings of impending doom; excess muscle tension; difficulty relaxing; and excessive worry. *Id*. at 685-86.[3] As was the case with the many physicians that had previously treated Plaintiff, Dr. Alimasuya changed her medicinal regimen and dosing – this time, with a special focus on her bipolar disorder and anxiety disorder. *Id*. at 687-88.

Plaintiff continued her treatment relationship with Dr. Alimasuya for the better part of a year. *See id*. at 685-727. In August of 2017, he observed that Plaintiff was distracted and defensive, with loosely associated circumstantial thoughts; that she manifested signs of anxiety; and, that she evidenced an abnormally short attention span. *Id*. at 690. Once again, he adjusted her medicinal regimen and dosing. *Id*. at 691. A few months later, in October of 2017, Plaintiff complained of forgetfulness and was "sometimes oblivious to everything." *Id*. at 692. Noting that she still appeared to be defensive and anxious, with a circumstantial thought process, along with indications of anxiety and a short attention span, Dr. Alimasuya once again adjusted her medicinal regimen and dosing. *Id*. at 693, 695. However, in January of 2018, Plaintiff reported that her condition had not improved at all, and Dr. Alimasuya observed that she was glum, defensive, anxious, unhappy, listless and anergic, and downcast with a constricted affect; noting that her thoughts were circumstantial and loosely associated, he once again changed her medicinal regimen and dosing. *Id*. at 697-99. Without belaboring what appears to be the repetitive details of a cycle of trial and error with ever-changing, but never effective, medicinal regimens, Dr. Alimasuya made several more such adjustments in again 2018 – but to no ultimate avail. *See id*. at 701 (new medications caused constipation), 702 (behavior and mental status findings were unchanged); 704 (medications were changed again); 882 (medications were changed again, but the rage issues persist and were now attended with blurry vision, apathy, and an inability to chew due to soreness in the teeth or jaw); 884-86 (medications changed again, but to no avail); 946 (a diagnosis of major depressive disorder was added); 1000-02 (medications were changed again with no improvement in her symptoms & Dr. McAtee expresses concurrence in Dr. Alimasuya's major

---

[3] As mentioned below (*see infra* p. 17-18), this expansive list of symptoms with which Plaintiff is afflicted, combined with the limitations assessed by Dr. McAtee, essentially meet, or at least equal, the severity of the criteria of subparts A and B, for both depression and bipolar disorder. *See generally* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04(A)(1) and (A)(2), and 12.04(B).

depressive disorder diagnosis).

*Medical Opinion Evidence*:

In November of 2019, Dr. McAtee completed a mental residual functional capacity questionnaire regarding Plaintiff's limitations due to her fibromyalgia, her depression, her confusion associated with the migraine pain, and her social dysfunction and need for isolation. *Id*. at 1139-41. She rated Plaintiff's mental abilities to function independently, appropriately, effectively, and on a sustained basis, without direct supervision or undue interruptions or distractions, for 8 hours per day, 5 days per week, in a regular competitive work setting for more than six consecutive months as follows: mild to moderate limitations in several categories of Plaintiff's abilities related to understanding and remembering; marked to extreme limitations in a number of subcategories of Plaintiff's abilities to maintain sustained concentration and memory, along with mild to moderate limitations in several other subcategories; mild to moderate limitations in several categories of Plaintiff's abilities regarding social interaction; and, moderate to marked limitations in several categories of Plaintiff's ability to adapt. *Id*. at 1139-40. Dr. McAtee also concluded that the limitations associated with Plaintiff's mental impairments would combine to cause her to be absent from work for 5 or more days every month, and that her symptoms would cause her to be unable to complete a full workday (due to her frequent need to seek treatment) for another 5 days per month. *Id*. at 1141. Dr. McAttee also noted that there was no evidence of malingering, and that Plaintiff's limitations likely began as early as 2002. *Id*.

Dr. McAtee also assessed Plaintiff's physical functional capacity as a result of limitations caused by her migraine headaches. *Id*. at 1142-45. Due to the symptoms associated with Plaintiff's migraines (which include eye pain, facial numbness, confusion, blurred vision, dizziness, nausea, vomiting, insomnia, neck pain, head pain, and depression), Plaintiff should be expected to be off-task for more than 25% of any given day, and absent from work for more than 4 days per month. *Id*. at 1142, 1144. She also opined that Plaintiff's symptoms could be expected to give rise to a need for unscheduled breaks during 3 to 4 days in the course of any given week, where the break might be expected to last anywhere from 15 minutes to 8 hours during which Plaintiff would need to lie down or sit quietly before being able to return to work. *Id*. at 1145.

10

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909. The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*id*. § 416.920; *see also id*. at § 404.1520). While the claimant bears the burden of proof at steps one through four (*see Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020)), "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Here, the ALJ appropriately set forth the applicable law regarding the required five-step sequential evaluation process. AR at 20-21.

At step one, the ALJ must determine if the claimant is presently engaged in "substantial gainful activity," 20 C.F.R. § 404.1520(a)(4)(i), which is defined as work done for pay or profit and involving significant mental or physical activities. *See Ford*, 950 F.3d at 1148. Here, the ALJ determined Plaintiff had not performed substantial gainful activity during the relevant period. AR at 21. At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe" (*see* 20 C.F.R. § 404.1520(a)(4)(ii)), "meaning that it significantly limits the claimant's 'physical or mental ability to do basic work activities.'" *Ford*, 950 F.3d at 1148 (quoting 20 C.F.R. § 404.1522(a)). If no severe impairment is found, the claimant will not be found to be disabled. 20 C.F.R. § 404.1520(c). Here, while inexplicably finding Plaintiff's fibromyalgia to be non-severe, the ALJ determined Plaintiff had the following severe impairments: migraines; degenerative disc disease of the lumbar and cervical spine; depression; and, anxiety. AR at 22.

At step three, the ALJ is tasked with evaluating whether the claimant has an impairment or combination of impairments that meet or equal an impairment in the "Listing of Impairments." *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1. The listings describe impairments that are considered to be sufficiently severe to prevent any individual so afflicted

from performing any gainful activity. *Id*. at § 404.1525(a). Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria of that listing." *Id*. at § 404.1525(c)(3). In order for a claimant to show that his or her impairment matches a listing, it must meet all of the specified medical criteria; and, an impairment that manifests only some of those criteria, no matter how severely, does not "meet" that listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If an impairment either meets the listed criteria, or if one or more impairments are determined to be medically equivalent to the severity of that set of criteria, that person is conclusively presumed to be disabled without a consideration of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Here, the ALJ determined Plaintiff did not have an impairment or combination of impairments that meets or equals the criteria or the severity of any of the listings. *See* AR at 22-25.

If a claimant does not meet or equal a listing, the ALJ must formulate the claimant's residual functional capacity ("RFC"), which is defined as the most that a person can still do despite the limitations associated with their impairments. *See* 20 C.F.R. § 404.1545(a)(1). Here, the ALJ determined that Plaintiff retained the ability to perform work at the light exertional level subject to certain exertional, postural, and environmental limitations. *See* AR at 25-30. Following the formulation of the RFC, the ALJ must determine – at step four – whether the claimant is able to perform her past relevant work, which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *See* 20 C.F.R. § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform her past relevant work, the claimant will not be found disabled. *Id*. § 404.1520(f). Otherwise, at step five, the burden shifts to the agency to prove that the claimant can perform a significant number of other jobs that are available in the national economy. *See Ford*, 950 F.3d at 1149. To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines (commonly referred to as "the grids"), 20 C.F.R. Pt. 404 Subpt. P, App. 2; or, alternatively, the ALJ may rely on the testimony of a VE. *Ford*, 950 F.3d at 1149 (citation omitted). A VE may offer expert opinion testimony in response to hypothetical questions about whether a person with the physical and mental limitations imposed by the claimant's medical

12

impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy, or the demands of other jobs that may be available in the national economy. *See* 20 C.F.R. § 404.1560(b)(2). An ALJ may also use other resources for this purpose, such as the Dictionary of Occupational Titles ("DOT"). *Id*. Here, the ALJ determined – based on the Dictionary of Occupational Titled ("DOT") – that Plaintiff would not have been able to perform her past relevant work as a material expediter as that position is classified by the DOT as requiring semi-skilled work at the medium exertional level. *See* AR at 30. Lastly, at step five, the ALJ determined – based on the VE's testimony – that Plaintiff would have be able to perform the functions of an electronics worker, a printer circuit board pre-assembler, or a final assembler, all of which jobs existed in substantial numbers in the national economy. *See* AR. at 32-33. Accordingly, the ALJ determined that Plaintiff had not been disabled at any time during the relevant period. *Id*. at 33.

## DISCUSSION

Under recently promulgated regulations that apply to Plaintiff's application, ALJs are required to evaluate the "persuasiveness" of all medical opinions according to several factors (*see* 20 C.F.R. § 416.920c). The first two factors, supportability and consistency, are considered the most important, and the ALJ is required to explicitly address them in his or her decision. *See* 20 C.F.R. § 416.920c(b)(2). The ALJ "may, but [is] not required to," explain how he or she considered the remaining three factors listed in the regulations. *Id*. Although the regulations have eliminated the physician hierarchy, deference to specific medical opinions, and assigning certain weight to any given medical opinion, the ALJ must still articulate how he or she considered the medical opinions and how persuasive he or she finds all of the medical opinions. *See V.W. v. Comm'r of Soc. Sec.*, No. 18-cv-07297-JCS, 2020 WL 1505716, at *14 (N.D. Cal. Mar. 30, 2020); 20 C.F.R. § 416.920c(a), (b). As with all other determinations made by the ALJ, the ALJ's persuasiveness explanation must be supported by substantial evidence. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

The ALJ in this case found Dr. McAtee's opined limitations to be unpersuasive based on a

non-specific and incorrect assertion to the effect that "the longitudinal medical evidence [is] not consistent with Dr. McAtee's opinions regarding the claimant's physical and mental limitations." *See id*. at 30. To justify this conclusion, the ALJ relied on isolated snippets from the record – largely taken out of context – to the effect that on one or another occasion, Plaintiff appeared to be in "no distress and was cooperative and pleasant." *Id*. Because the overwhelming tide of the record evidence (as set forth above) eminently supports Dr. McAtee's conclusions, and because the ALJ's non-persuasiveness determination was not based on substantial evidence[4] – the court finds that the ALJ's non-persuasiveness determination (and by extension, her entire evaluation from step three forward) was erroneous. Accordingly, because the ALJ improperly rejected Dr. McAtee's opinions, her opinions are herein credited as true as a matter of law. *See Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995) ("[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law."); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) ("Because the ALJ failed to provide legally sufficient reasons for rejecting Benecke's testimony and her treating physicians' opinions, we credit the evidence as true."); *see also Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an opportunity for remand and further proceedings to establish his credibility.").

The ALJ also rejected Plaintiff's pain and symptom testimony in a similar manner. *See id*. at 27-29. The ALJ noted that "the medical evidence of record does not support the persuasiveness of the claimant's allegations regarding her impairments" because "[t]he objective findings fail to

---

[4] This non-persuasiveness finding can be fairly characterized as the rejection of virtually the entirety of the years-long medical record in this case, as Dr. McAtee's opinion was consistent and harmonious with the findings of a host of doctors. The lion's share of the medical evidence in this case was essentially rejected *en masse* because of a suggestion that it was "inconsistent" with a very small handful of isolated snippets of information, generally entered by intake staff at hospitals or doctors' offices. Since "substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," (*see Biestek*, 139 S. Ct. at 1154), the ALJ's approach is categorically incapable of satisfying this standard because no reasonable mind would ever accept such a small smattering of snippets of intake information as sufficient to negate the well-supported and considered opinions of Dr. McAtee, especially because her opinions were based on a years-long treatment relationship, countless clinical observations, a host of specialized diagnostic tools and techniques, as well as the fact that her opinions are consistent with and supported by the entirety of the medical evidence of record.

provide *strong* support for the claimant's allegations of disabling symptoms." *Id*. at 27 (emphasis added) (It is unclear what the ALJ was seeking by requiring "strong" support, as contrasted with ordinary support). The ALJ then added that "the claimant's daily activities also demonstrate that she is not disabled" because "she cared for her children and pets with assistance from her partner, which included dressing her children, preparing them cereal, driving her son to school occasionally and driving to pick her son up from school most of the time . . . [and] she admitted that she could count change [and] said she liked to read the Bible and watch movies." *Id*.

It has long been established that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir.1981)). "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."); *see also Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (ordering award of benefits for constant back and leg pain despite claimant's ability to cook meals and wash dishes); *see also Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir. 1986) (claim of pain-induced disability not undermined by the ability to engage in periodic restricted travel); *but cf. Fair*, 885 F.2d at 603 (On the other hand, "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain."); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (same). Here, the ALJ made no such transferability finding. *See* AR at 27-29.

When a claimant has medically documented impairments that "might reasonably produce the symptoms or pain alleged and there is no evidence of malingering, the ALJ must give 'specific, clear, and convincing reasons for rejecting' the testimony by identifying 'which testimony [the ALJ] found not credible' and explaining 'which evidence contradicted that testimony.'" *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 489, 494 (9th Cir. 2015)). "This is not an easy requirement to meet: 'the

15

clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). "The ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded by regulation on unrelated grounds). Also, while an ALJ cannot reject the severity of subjective complaints merely due to the lack of corroborating objective evidence, the ALJ may nonetheless look to the medical record for inconsistencies. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599-600 (9th Cir. 1999) (finding that "[t]he ALJ provided clear and convincing reasons for rejecting [Plaintiff's] testimony" by "point[ing] to specific evidence in the record—including reports by [Plaintiff's doctors]—in identifying what testimony was not credible and what evidence undermined [Plaintiff's] complaints").

The ALJ's explanations failed to meet these standards for numerous reasons. First, the ALJ's explanations are non-specific in that it is unclear which portions of Plaintiff's testimony were rejected and which portions were not. Second, as to whatever portions the ALJ intended to reject, there are no specific findings about what record evidence undermined which portions of Plaintiff's testimony. Third, as to the explanations that are given, they are neither clear, nor at all convincing. No one would agree that being able to count a few coins is the touchstone of the disability determination. Neither would anyone agree that "preparing cereal" should be determinative, or frankly even relevant, as it merely involves pouring a lightweight dry substance into a bowl and then adding milk. Then there is the ALJ's attempt to take advantage of indeterminate syntax (e.g., stating that Plaintiff engaged in certain routine household activities <u>with assistance</u> from her husband – without exploring the nature and extent of the husband's assistance). All of which is unavailing because the ALJ's adverse credibility determination appears to assume that only a perfectly catatonic person (one who cannot read, count coins, "prepare cereal," or watch television) might be eligible for disability assistance. This assumption is, of course, incorrect. For these reasons, the court finds that the ALJ improperly rejected Plaintiff's testimony; accordingly, the entirety of Plaintiff's testimony will now be credited as true as a matter of law. *See Lester*, 81 F.3d at 834; *Benecke*, 379 F.3d at 594; *see also Moisa*, 367 F.3d

16

at 887.

**<u>Nature of Remand</u>**

In deciding whether to remand for further proceedings or for an immediate calculation and payment of benefits courts consider the likely utility of further proceedings. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1169 (9th Cir. 2008). A district court may "direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen*, 80 F.3d at 1292. Courts must apply a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison*, 759 F.3d at 1021-23 (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required). For the reasons stated below, the court finds that all three of these conditions are easily satisfied.

In light of the above-discussed medical opinion evidence, as well as Plaintiff's testimony, it is clear to the court that Plaintiff has in fact been disabled since her onset date, and it is equally clear that further administrative proceedings would be useless because the ALJ would now be required to find Plaintiff disabled at several junctures on remand. In light of Dr. McAtee's opinions, the combination of Plaintiff's mental and physical impairments at least equal (if not meet) the severity of the criteria for listing-level depression and bipolar disorder (Listing 12.04), as well as anxiety and obsessive-compulsive disorders (Listing 12.06). However, it would be inexpedient and unnecessary for the court to trek through the details of the listings' analysis here because it is equally clear that Plaintiff has no residual functioning capacity at all. And yet, an

17

elaborate discussion in that regard is also unnecessary because it is beyond dispute that the ALJ would be required to find Plaintiff disabled at step five based on the VE's testimony.

To recapitulate the pertinent details, Dr. McAtee concluded that Plaintiff's depression, bipolar disorder, and anxiety would combine to cause her to be absent from work for 5 or more days every month, and that her symptoms would cause her to be unable to complete a full workday (due to her frequent need to seek treatment) for another 5 days per month. *Id*. at 1141. She also concluded that the symptoms associated with Plaintiff's migraines (which include eye pain, facial numbness, confusion, blurred vision, dizziness, nausea, vomiting, insomnia, neck pain, head pain, and depression), would cause her to be expected to be off-task for more than 25% of any given day, and absent from work for another 4 days (or more) per month. *Id*. at 1142, 1144. Because the VE testified that if an individual were absent from work as little as three times per month – or, if a person were to be even "leaving early that frequently" (i.e., three times per month) – such absenteeism would preclude sustaining competitive employment, (*see id*. at 65), the court concludes that the ALJ would – at the very least – be required to find Plaintiff disabled at step five pursuant to the VE's testimony.

Lastly, it should be noted that in cases where each of the credit-as-true factors is met, it is generally only in "rare instances" that a review of the record as a whole gives rise to a "serious doubt as to whether the claimant is actually disabled." *Revels v. Berryhill*, 874 F.3d 648, 668 n.8 (9th Cir. 2017) (citing *Garrison*, 759 F.3d at 1021). This is not one of those "rare instances," because the record leaves no room whatsoever to harbor any doubt that Plaintiff has in fact been disabled since her onset date. Needlessly remanding a disability claim such as this for further unnecessary proceedings would serve no end other than to delay much needed income for claimants such as Plaintiff who are obviously unable to work and who are clearly entitled to benefits; doing so would in turn subject them to "tremendous financial difficulties while awaiting the outcome of their [nugatory] appeals and proceedings on remand." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988). In other words, the court is satisfied that the ALJ's unsupported conclusions were thoroughly negated by the entirety of the record evidence which conclusively and convincingly establishes Plaintiff's longstanding disability such that no

further inquiry is necessary.

## CONCLUSION

Accordingly, for the reasons stated herein, Plaintiff's Motion for Summary Judgment (dkt. 18) is **GRANTED**, and Defendant's Cross-Motion (dkt. 21) motion is **DENIED**. The ALJ's finding of non-disability is **REVERSED**, and the case is **REMANDED** for the immediate calculation and award of benefits consistent with the findings and holdings expressed herein.

**IT IS SO ORDERED.**

Dated: September 19, 2022

                                                                          ROBERT M. ILLMAN
                                                                          United States Magistrate Judge